**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BENNY SUTTON, | ) | CASE NO. 1:12-CV-2683 |
| | ) | |
| Plaintiff, | ) | JUDGE GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Benny Sutton ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner")[1], denying

his applications for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a), and for Period of Disability ("POD") and

Disability Insurance Benefit ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i), 423.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below,

the Magistrate Judge recommends that the Commissioner's final decision AFFIRMED.

## I.  PROCEDURAL HISTORY

In May and June, 2009, Plaintiff filed applications for POD, DIB and SSI, alleging

a disability onset date of May 5, 2005.  (Transcript ("Tr.") 11.)  The application was

---

[1]  On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of
Social Security.  She is automatically substituted as the defendant in this
case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id*.)  On May 10, 2011, an ALJ held Plaintiff's hearing.  (*Id*.)  Plaintiff appeared, was represented by an attorney, and testified.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id*.)  During the hearing, Plaintiff amended his applications to allege an onset date of September 29, 2006.[2]  (Tr. 1, 65.)  On June 30, 2011, the ALJ found that Plaintiff was not disabled.  (Tr. 23)  On August 22, 2102, the Appeals Counsel declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 26, 2012, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case. (Doc. Nos. 18, 19, 20.)  Plaintiff argues that substantial evidence does not support the ALJ's calculation of Plaintiff's RFC, or his determination that Plaintiff could perform his past relevant work as a hand packer.

---

[2]     Plaintiff previously filed an application for POD and DIB in February 2006, alleging an onset date of May 5, 2005.  (Tr. 106.)  After the application was denied initially and on reconsideration, an ALJ determined that Plaintiff had been disabled for a closed period from September 29, 2006 through July 2, 2008.  (Tr. 105-12.)  That ALJ determined that Plaintiff had both exertional and non-exertional limitations during the period of disability.  (Tr. 109.)  In this case, after Plaintiff's June 2011 hearing, the ALJ determined that he was not bound by the prior ALJ's calculation of Plaintiff's residual functional capacity ("RFC").  (Tr. 17.)  Further, the ALJ in this matter declined Plaintiff's request to reopen his earlier application.  (*Id*.)  Plaintiff, however, does not raise any argument regarding either the RFC calculated by the prior ALJ, the decision by the ALJ in this case to decline to reopen his application, or the ALJ's conclusion in this case that he was not bound by the prior ALJ's determination of Plaintiff's RFC.

2

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Plaintiff was born on April 29, 1958.  (Tr. 396.)   He graduated high school and completed some college courses.  (*Id*.)  He had past relevant work experience as a security guard, newspaper carrier, order puller, packer, cleaner and stock person.  (Tr. 84.)

**B.    Medical Evidence**

**1.    Attorney-Supplied Evidence**

In February 1996, Kenneth R. Felker, Ph.D., performed a psychological evaluation on Plaintiff.  (Tr. 552-56.)  Plaintiff reported depression and anxiety.  (Tr. 552.)  Dr. Felker noted that Plaintiff's attention span and concentration were "acceptable," and that his insight and judgment were "fair."  (Tr. 554.)  The Weschler Adult Intelligence Scale ("WAIS") revealed that Plaintiff had a full scale IQ of 76, verbal IQ of 73 and a performance IQ of 81, placing him in the "borderline to dull-normal range of ability."  (Tr. 555.)  Other testing revealed that Plaintiff read at a 3.8 grade level, and that his memory function was within the borderline range.  (*Id*.)

Dr. Felker diagnosed Plaintiff with dysthymia with evidence of significant anxiety, as well as a developmental reading disorder.  (Tr. 556.)  He assigned Plaintiff a mild-to-moderate restriction in his ability to concentrate and attend to tasks, and to relate to others and deal with the general public.  (*Id*.)  Dr. Felker assigned Plaintiff a mild impairment in his ability to understand and follow instructions; and carry out routine one and two step tasks.  (*Id*.)  Finally, Dr. Felker opined that Plaintiff was mildly restricted in

3

his ability to relate to work peers and supervisors, and to tolerate the stress associated with employment.  (*Id*.)

On February 18, 2011, Michael B. Leach, Ph.D., examined Plaintiff at the request of his counsel.  (Tr. 523-36.)  Dr. Leach noted that Plaintiff had difficulty maintaining attention and concentration throughout the evaluation, and that his speech was halting.  (Tr. 527.)  At times, Plaintiff lost his train of thought.  (*Id*.)  The WAIS revealed a full scale IQ of 79, placing Plaintiff in the borderline range.  (Tr. 529.)  Plaintiff scored in the borderline or low average range in verbal skills and abilities, perceptual reasoning, attention and concentration, and processing speed.  (*Id*.)  Other testing placed Plaintiff at a 2.9 grade level in reading, a 3.1 in written language, and a 7.7 in mathematics, placing at a 3.7 (the seventh percentile) in overall academic fluency.  (Tr. 530.)  Plaintiff demonstrated "deficits in overall cognitive functioning related to memory."  (Tr. 531.)

Dr. Leach diagnosed Plaintiff with a cognitive disorder, not otherwise specified; moderate, recurrent major depressive disorder; alcohol and cannabis abuse; and borderline intellectual functioning.  (Tr. 533.)  He assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 39.  (*Id*.)  Dr. Leach opined that Plaintiff was "extremely impaired" in his "ability to function on a daily basis," and in concentration, persistence and pace.  (Tr. 534-35.)   He assigned Plaintiff a marked impairment in his social functioning.  (Tr. 534.)  Dr. Leach opined that Plaintiff was likely to experience periods of decompensation.  (Tr. 535.)  He concluded that Plaintiff was "extremely impaired" in the ability to: relate to others in the workplace; maintain concentration, persistence and pace; and manage the stresses and pressures of daily

4

work.  (Tr. 535-36.)  He determined that Plaintiff was markedly impaired in his ability to understand, remember and follow directions.  (Tr. 535.)

In September 2011 – after Plaintiff's administrative hearing – Plaintiff underwent a vocational evaluation conducted by Peter Frey, M.Ed., LPC, CRC, NCC, CDMS, CCM.  (Tr. 558-63.)  Testing placed Plaintiff at a 4.8 grade level in word reading; 4.7 in sentence comprehension; 2.8 in spelling; and 6.9 in math computation.  (Tr. 559.)  Mr. Frey opined that Plaintiff's "vocational strengths" included: basic math skills; the ability to handle money and make change; the ability to establish a rapport one on one in a controlled environment; a better than average ability to manipulate basic hand tools; an expressed desire to work; and good hygiene.  (Tr. 562-63.)  Mr. Frey determined that Plaintiff's "vocational barriers" were: poor reading comprehension skills; lack of attention to detail; slow in dexterity; and inability to discern differences in objects (quality control).  (Tr. 563.)  Mr. Frey concluded that Plaintiff would benefit from vocational training programs at Goodwill or Vocational Guidance Services, and opined that he could work as a groundskeeper or assembly-press operator.  (*Id*.)

### 2.    Treating Providers

On March 6, 2009, an advanced practice nurse at the Murtis H. Taylor Multi-Service Center ("Murtis Taylor") examined Plaintiff, noting his report that he lived alone, slept well and had a good appetite.  (Tr. 392.)  She characterized his eye contact and attitude as "ok" and noted that his appearance, grooming and speech were within normal limits.  (*Id*.)  She described him as euthymic, and noted that he was taking Wellbutrin and Abilify.  (*Id*.)  Plaintiff denied hallucinations, paranoia and delusions.

5

(*Id*.) Nurse Cirpriani diagnosed Plaintiff with major depressive disorder with psychotic features, stable on medication, and continued his medications.  (*Id*.)  An examination on April 27, 2009 revealed similar results, with Plaintiff reporting that he was working part time in maintenance for the Cleveland Metropolitan Housing Authority ("CMHA").  (Tr. 391.)

On May 27, 2009, Plaintiff reported that he was not taking the Abilify becuse he did not like it, and that he was not consistent in taking his Wellbutrin daily.  (Tr. 390.) On September 3, 2009, Nurse Cirpriani noted that Plaintiff was "motivated" with "organized thoughts," and denied hallucinations.  (Tr. 424.)  She continued Plaintiff on the Wellbutrin.  (*Id*.)  On October 19, 2009, Nurse Cipriani recorded Plaintiff's report of recent polysubstance abuse, noting that he had not admitted to abusing alcohol and marijuana until that date.  (Tr. 423.)  Plaintiff told Nurse Cirpriani that he intended to attend Alcoholics Anonymous meetings.  (*Id*.)  Examinations at Murtis Taylor in December 2009, January 2010, and February 2010 all reflect that Plaintiff was euthymic, denied auditory and visual hallucinations, and continued to abuse marijuana and alcohol.  (Tr. 420-22.)

On June 10, 2010, Nurse Cipriani authored a letter to an unspecified health care provider, stating that Plaintiff had been a client at Murtis Taylor since February 2007, and that he had been diagnosed with major depressive disorder and polysubstance abuse.  (Tr. 514.)  She noted that he had not been consistent in attending his scheduled appointments.  (*Id*).  She indicated that Plaintiff had taken Wellbutrin until June 2010, when he reported having a seizure while taking the medication.  (*Id*.)

6

On September 27, 2010, Nurse Cipriani noted Plaintiff's report that he had received an eviction notice and was experiencing stress.  (Tr. 518.)  Plaintiff continued to drink a half-pint of alcohol and smoke marijuana during the weekend.  (*Id*.)  Nurse Cipriani characterized Plaintiff's mood as "ok," but noted that Plaintiff "needs re-direction during conversaton/discussions."  (*Id*.)  She opined that his major depressive disorder was in remission.  (*Id*.)  Plaintiff declined medication.  (*Id*.)

On January 4, 2011, Nurse Cipriani noted that she had not examined Plaintiff in over three months.  (Tr. 517.)  He reported that he was working full time at a temporary agency, and that he was leasing an apartment from his brother.  (*Id*.)  On February 14, 2011, Plaintiff reported that he had been terminated from his job because he made a mistake with the schedule after reading it without his glasses.  (Tr. 516.)  He was depressed about the loss of his job.  (*Id*.)  Nurse Cipriani opined that Plaintiff may have a learning disability and recommended that he undergo diagnostic testing.  (*Id*.)  In March 2011, Plaintiff reported sadness over the loss of his job, and was "somewhat depressed."  (Tr. 538.)  He reported mild paranoia and some problems with concentration.  (*Id*.)

### 2. Agency Reports and Assessments

On October 9, 2009, Margaret Zerba, Ph.D., performed a consultative examination on Plaintiff.  (Tr. 396-400.)  She noted that Plaintiff used public transportation to travel to the examination.  (Tr. 396.)  Plaintiff reported that, at the time of the examination, he was working 24 hours each week, and had previously driven an RTA bus.  (Tr. 397.)  Plaintiff stated that he enjoyed fishing, spending time with his 21-

7

year old son, and working with tools related to his maintenance job.  (Tr. 399.)

Dr. Zerba described Plaintiff's grooming and hygiene as "excellent" and noted that Plaintiff was cooperative.  (*Id.*)  His conversation was spontaneous, organized and coherent.  (Tr. 397.)  Dr. Zerba noted that Plaintiff appeared depressed with flat affect, but reported no problems with anxiety or panic attacks.  (*Id.*)  Plaintiff reported a history of auditory hallucinations, but stated that they ended after he started taking Wellbutrin.  (Tr. 398.)  After a series of cognitive tests, Dr. Zerba opined that Plaintiff was functioning with the range of average intelligence, and that he poor insight and judgment.  (*Id.*)  Plaintiff reported drinking alcohol and smoking marijuana on weekends.  (Tr. 399.)

Dr. Zerba diagnosed Plaintiff with dysthymia, alcohol abuse and cannabis abuse.  (*Id.*)  She opined that Plaintiff was not impaired in his ability to: understand and follow directions; pay attention to perform simple, repetitive tasks; and relate to others in the work environment.  (Tr. 400.)  She concluded that he was moderately impaired in his ability to withstand stress and pressures of day to day work activity, due to his chronic depression, drug and alcohol abuse, and poor insight and judgment.  (*Id.*)  She assigned Plaintiff a GAF score of 50.  (*Id.*)

On December 9, 2009, agency consultant Melanie Bergsten, Ph.D., completed a psychiatric review technique and a mental RFC assessment.  (Tr. 401-14, 415-18.)  She opined that Plaintiff was not significantly limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

8

interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 415-16.)  She opined that Plaintiff was moderately limited in his ability to: complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.  (Tr. 416.)

Dr. Bergsten assigned "partial weight" to Dr. Zerba's opinions, noting that "a mild limitation in relating to others seems more appropriate, given [Plaintiff's] history of psychosis and ongoing depression."  (Tr. 417.)  She opined that Plaintiff "would be best-suited [*sic*] mentally in positions where duties are relatively static and changes can be explained."  (Tr. 418.)

### 3.     Statements from Plaintiff's Family

In a July 9, 2009, Third Party Adult Function Report, Plaintiff's sister, Margaret C. Gentry, noted that she "very seldom" saw him.  (Tr. 296.)  She had no knowledge of his daily activities.  (*Id*.)  She stated that Plaintiff could occasionally "look homeless" when he needed to shave and get a hair cut.  (Tr. 298.)  She reported that chores could take Plaintiff "all day because he's not a finisher."  (*Id*.)

In an unsigned May 8, 2011 statement,  Plaintiff's son, Tyrell Hamp, stated as follows:

Plaintiff had always been "a bit weird," but had "got a lot worse and depressed" when Plaintiff's mother passed away five years prior.  (Tr. 550.)  Although Plaintiff

9

worked, he spent most of his time alone at home.  (*Id*.)  Plaintiff lived above his

brother's house.  (*Id*.)   Mr. Hamp had occasionally helped Plaintiff financially and

brought him food.  (*Id*.)  Plaintiff's conversations could be confusing because "his line of

thought is often jumbled and he will change topics frequently."  (*Id*.)  Although Plaintiff

would greet and catch up with family members, Plaintiff generally kept to himself in

large gatherings.  (Tr. 551.)

**C.     Hearing Testimony**

**1.     Plaintiff's Testimony**

At his May 10, 2011 administrative hearing, Plaintiff testified as follows:

Plaintiff drank alcohol three to four times per week.  (Tr. 70.)  When he was

working, he drank less often.  (*Id*.)  When asked why he could not work, Plaintiff

responded:

> I can work – supervisorially, I can work pretty much two to
> four hours, but other than that, that's – it's just – I can't really
> determine right now, you know, but I have an issue, it's a
> issue, you know, that I really can't really describe right now.

(Tr. 72.)  Plaintiff lived above his brother in a duplex house, and was three months

behind in his rent.  (*Id*.)  His son helped him by purchasing food and cleaning supplies,

and his sister paid him to perform odd jobs like mowing the lawn.  (Tr. 72-73.)  On an

average day, Plaintiff watched television, and went to the Family Job Service Center to

apply for jobs over the Internet.  (Tr. 74.)  He cleaned his home, and visited with

relatives who lived nearby.  (*Id*.)

Plaintiff worked for CMHA from 2008 until 2010.  (Tr. 75.)  He cleaned and swept

hallways, and emptied trash compactors.  (Tr. 75-76.)  He also worked in maintenance,

10

cutting grass and planting flowers, putting in tiles and carpet, mounting cabinets and putting up doors.  (Tr. 76.)  He performed this work with other people.  (*Id*.)  Plaintiff worked between 20 and 23 hours each week.  (Tr. 76-77.)

Plaintiff worked for Ameritemps from June 2010 to January 2011.  (Tr. 77.)  He drove a van transporting passengers to job sites in Cuyahoga County.  (*Id*.)  Plaintiff was the subject of multiple complaints due to tardiness and mixing up job sites.  (Tr. 78.)  Ameritemps discharged Plaintiff after he made too many mistakes regarding the transportation schedule.  (Tr. 80.)  Plaintiff could not read the schedules after someone new began writing them down.  (*Id*.)

Plaintiff graduated high school and completed some college courses in data processing.  (Tr. 90-91.)  Those courses required him to read around four hours each day.  (Tr. 91.)  He had not received any special assistance in those courses.  (*Id*.)

### 2.    VE Testimony

The ALJ described the following hypothetical individual to the VE:

> Let's assume we have a hypothetical person that has no specific exertional limitations.  He is able to occasionally make simple work-related decisions.  He is able to tolerate occasional changes in the work setting.  He is able to perform only simple, routine, repetitive tasks.  He is unable to adhere to strict high production standards.  He is unable to adhere to a rapid rate of production.  He is able to tolerate no more than occasional superficial contact with a small group of familiar people.  In fact, he would work best by himself or with a small group of familiar coworkers.  He should not be required to work with the general public, and he is able to tolerate occasional supervision.

(Tr. 87.)  The VE opined that the hypothetical individual would be able to perform Plaintiff's past relevant work as a hand packager, order puller or stock person.  (Tr. 87-

88.)  The VE testified that the hand packer position was unskilled, medium work with a special vocational profile ("SVP") of 2.  (Tr. 86.)  The VE also testified that the hypothetical individual would be able to perform work as a cleaner, laundry worker, cafeteria attendant or kitchen helper.  (Tr. 88-89.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; _Kirk v. Sec'y of Health & Human Servs.,_ 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 _and_ 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) _and_ 416.920(a)(4); _Abbott v. Sullivan,_ 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) _and_ 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) _and_ 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  _Abbot,_ 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

12

severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

In his April 14, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff meets the insured status requirements of the Act through December 31, 2008.

2.   Plaintiff has not engaged in substantial gainful activity since July 3, 2008.

3.   Plaintiff has the following severe impairments: alcohol and marijuana abuse, depression, and borderline intellectual functioning/cognitive disorder.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: He is able to perform simple, routine, repetitive tasks.  He is able to occasionally make simple, work-related decisions.  He is able to tolerate occasional changes in the work setting.  he is unable to adhere to strict, high-demand production standards.  He is unable to adhere to a rapid rate of production.  He is able to engage in no more than occasional, superficial contact with others.

13

He would work best by himself or with a small group of familiar co-workers. He should not be required to work with the general public. He is able to tolerate occasional supervision.

6.    Plaintiff is capable of performing past relevant work as a hand packer. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

7.    Plaintiff has not been under a disability, as that term is defined in the Act, from July 3, 2008 through the date of this decision.

(Tr. 13-23.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. _Ealy v. Comm'r of Soc. Sec._, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. _Heston v. Comm'r of Soc. Sec._, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. _Id._ However, the court does not review the evidence _de novo_, make credibility determinations, or weigh the evidence. _Brainard v. Sec'y of Health & Human Servs._, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. _White v. Comm'r of Soc. Sec._, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  _Brainard_, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  _Ealy_, 594 F.3d at 512.

**B.     Plaintiff's Arguments**

Plaintiff argues that substantial evidence does not support the ALJ's calculation of Plaintiff's RFC or the ALJ's conclusion that Plaintiff could perform his past relevant work as a hand packer.  The Commissioner asserts that substantial evidence supports the ALJ's decision.

**1.     Plaintiff's RFC**

Plaintiff posits several bases for arguing that the substantial evidence does not support the ALJ's determination of Plaintiff's RFC.  First, Plaintiff argues that the ALJ's assessment of the evidence in the record is conclusory, and that the ALJ violated the requirements of Social Security Ruling 96-8p, which requires that an RFC assessment include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).  Here, Plaintiff contends that the ALJ's assessment of Plaintiff's RFC was conclusory because the ALJ "provided a cursory summary of the evidence in [Plaintiff's] record; there is little analysis to support the RFC finding." (Plaintiff's Brief ("Pl. Br.") at 9.)  Review of the decision, however, reveals that the ALJ's discussion of Plaintiff's RFC is not at all conclusory.  Rather, the ALJ devoted more than four pages of the decision to the RFC calculation, and discussed not only Plaintiff's

medical treatment records, but also Plaintiff's testimony and statements to the agency. (Tr. 16-21.)  Absent some specific example of how the ALJ failed to provide a sufficient narrative to support his RFC conclusion, this argument lacks merit.

Second, Plaintiff contends that the ALJ "inconsistently chose to find [Plaintiff] credible on some things but not credible on others."  (Pl. Br. at 10.)  Plaintiff further argues that, in making the credibility determination, the ALJ erroneously employed boilerplate language concluding that, while Plaintiff's impairments could reasonably be expected to cause the symptoms he described, his allegations regarding the intensity, persistence, and resulting limitations were not credible to the extent they were inconsistent with the RFC.  (Pl. Br. 10.)  These arguments are not well taken.

As a preliminary matter, no legal authority requires an ALJ to determine that a claimant's testimony is either entirely credible or entirely not credible.  Indeed, well-established case law prohibits "blanket assertions" regarding a claimant's credibility. _Rogers v. Comm'r of Soc. Sec._, 486 F.3d 234, 248 (6th Cir. 2007) ("In other words, blanket assertions that a claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.").

Further, there is no error in the ALJ's use of boilerplate in his decision.  To support his argument on this point, Plaintiff points to _Parker v. Astrue_, 597 F.3d 920, 922 (7th Cir. 2010), in which the Seventh Circuit criticized the ALJ's use of similar boilerplate language, calling it "meaningless boilerplate," because "[t]he statement by a trier of fact that a witness's testimony is 'not _entirely_ credible' yields no clue to what weight the trier of fact gave the testimony." (emphasis in original).  In this case,

16

although the ALJ's decision does utilize boilerplate language to state that Plaintiff's allegations regarding the intensity and effects of his impairments were not credible, unlike the decision in *Parker*, the decision in this case does not solely rely on that language to support the ALJ's credibility determination.  Rather, thereafter in the decision, the ALJ engaged in a lengthy analysis of Plaintiff's credibility.  Accordingly, the ALJ did not err in including this boilerplate in the decision.

To the extent Plaintiff argues that substantial evidence does not support the ALJ's credibility determination, that argument also lacks merit.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

17

Here, the ALJ identified specific reasons for determining that Plaintiff was not credible in this regard.  The ALJ noted that Plaintiff's testimony – that he worked without special assistance as a cleaner and a maintenance worker, lived alone and operated a transportation van until he made a scheduling error – described activities "not consistent with what one would expect from a totally disabled individual." (Tr. 19.)  The ALJ also pointed to Plaintiff's testimony that he could not work more than two to four hours each day, but could not explain why.  (Tr. 20.)  Finally, the ALJ pointed to evidence, that, throughout Plaintiff's treatment, he continued to use alcohol and marijuana, which adversely affected his compliance with his medication and treatment regimens.  (*Id*.)  These specific reasons for finding Plaintiff not credible are evident in the record in this case and, thus, substantial evidence supports the ALJ's credibility finding.

Third, Plaintiff asserts that the ALJ improperly discredited or ignored evidence that contradicted his determination of Plaintiff's RFC.  Specifically, Plaintiff points to the records of Dr. Felker, Dr. Leach and Mr. Frey, as well as statements from Plaintiff's sister and son.  The ALJ did not err in failing to specifically address Dr. Felker's report because it was prepared in 1996, well before the relevant time period in this case.  Further, even if the ALJ did err in not addressing a medical report that was over 20 years old at the time of the hearing, Plaintiff fails to address how that failure caused him harm, particularly in light of the fact that Dr. Felker assigned Plaintiff only mild and mild-to-moderate limitations.  With respect to Mr. Frey's report, the record reveals that Plaintiff did not submit it for the ALJ's consideration.  Rather, Plaintiff included the report in his additional evidence to the Appeals Council,  (Tr. 4), and, thus, it is not

relevant to this Court's review of the ALJ's decision in this case.  *See* <u>Foster v. Halter,</u> <u>279 F.3d 348, 357 (6th Cir. 2001)</u> ("[T]his Court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.")

Further, substantial evidence supports the ALJ's decision to assign little weight to Dr. Leach's opinion.  Plaintiff argues that the ALJ's discussion of Dr. Leach's opinion was conclusory.  The record contradicts this contention, as the ALJ gave several reasons for his assessment of Dr. Leach's report:

> Little weight is given to evaluator Dr Leach's opinion because the extremity of the work-related limitations asserted, from a one-time evaluation in anticipation of litigation, are based upon [Plaintiff's] self-reports.  Also, the "extreme" and "marked" limitations indicated by Dr. Leach are simply not supported by the evidence considered in its entirety.

(Tr. 21.)  Further, because Dr. Leach was not Plaintiff's treating physician, his opinion was not entitled to controlling weight.  *See, e.g.,* <u>20 C.F.R. § 404.1527(c)(2)</u> ("If we find that a *treating source's opinion* on the issue(s0 of the nature and severity of your impairment(s) is well supported . . . we will give it controlling weight.") (emphasis added).  Rather, the ALJ was required to evaluate Dr. Leach's opinion using the factors set forth in the regulations, which require an ALJ to consider: the examining relationship, the treatment relationship, the extent to which the opinion is supported by medical evidence and is consistent with the record; and the physician's specialization. <u>20 C.F.R. § 404.1527(c)</u>; <u>20 C.F.R. § 416.927(c)</u>.  The ALJ's assessment of Dr. Leach's opinion reflects that he considered all of these factors in deciding to assign that opinion

little weight.[3]

Finally, substantial evidence supports the ALJ's decision to assign little weight to the statements of Plaintiff's sister and son.  As the ALJ noted, neither individual was an "acceptable medical source, the limitations are not supported by the record as a whole, his sister admitted she saw [Plaintiff] very seldom, and his son's statement was not signed."  (Tr. 21.)  Plaintiff argues that the ALJ violated Social Security Ruling 96-7p, which requires an ALJ to consider "the entire case record," including "statements and other information provided by . . . other persons about the symptoms and how they affect the individual."  S.S.R. 96-p, 1996 WL 374186, *1 (July 2, 1996).  Here, the ALJ's decision reflects that he considered these statements, and rejected them for the reasons set forth in the decision.  Although Plaintiff points to some evidence in the record suggesting that he had a more substantial relationship with his sister than her statement suggests, he does not explain how her statement demonstrates that the ALJ erred in calculating his RFC.  Accordingly, this argument lacks merit.

**2.      Plaintiff's Past Relevant Work**

The ALJ determined that Plaintiff could perform his past relevant work as a hand packer:

> [Plaintiff] performed work as a hand packer the past fifteen

---

[3]      Plaintiff also argues that the ALJ erred in assigning Dr. Zerba's opinion greater weight than Dr. Leach's opinion because both opinions were prepared after a single examination, and for the purpose of evaluation Plaintiff's entitlement to benefits.  In assigning "significant weight" to Dr. Zerba's opinion, however, the ALJ noted that it was "consistent with the record as a whole."  (Tr. 20.)  The inconsistency between Dr. Leach's opinion and the rest of the evidence in the record was one reason the ALJ assigned little weight to that opinion.

20

years.  Based on his report, his earnings for his work as a
hand packer qualify as substantial gainful activity.  The [VE]
testified that the hand packer was unskilled, SVP 2, and
classified as medium exertion work. [Plaintiff] performed the
job for more than one month, and thus was able to learn the
work.

\*   \*   \*

In comparing [Plaintiff's RFC] with the physical and mental
demands of this work, the undersigned finds that [Plaintiff] is
able to perform the hand packer job as it is actually and
generally performed.  The [VE] testified that [Plaintiff] is still
able to perform this past relevant work given his RFC.

(Tr. 21.)  Plaintiff argues that substantial evidence does not support the ALJ's

conclusion on this issue because the ALJ failed to analyze this issue as required by

Social Security Ruling 82-62.

Social Security Ruling 82-62 provides that, where an ALJ is determining whether

a claimant has the RFC to return to past relevant work, "[p]ast work experience must be

considered carefully to assure that the available facts support a conclusion regarding

the claimant's ability or inability to perform the functional activities required in this work."

S.S.R. 82-86, 1982 WL 31386, *2 (1982).  Further, "the decision whether the claimant

retains the functional capacity to perform past work which has current relevance has

far-reaching implications and must be developed and explained fully in the disability

decision."  Id. at *3.  Plaintiff argues that the ALJ violated the requirements of SSR 82-

62 by failing to: (1) make specific findings regarding the mental demands of the specific

tasks that comprise the hand packer position; and (2) reconciling these demands with

Plaintiff's RFC.

Plaintiff's argument lacks merit.  In his decision, the ALJ noted the VE's

21

testimony that the hand packer position was medium, unskilled work with an SVP of 2.

These designations describe the exertional and non-exertional demands of a particular

position.  Then, the ALJ specifically noted that he had compared Plaintiff's RFC – which

he had already described and discussed at length in his decision –  with the physical

and mental demands of the hand packer position, and had determined that Plaintiff was

capable of performing the work.  This discussion sufficiently develops and explains the

ALJ's reasoning with respect to this issue.

Plaintiff also argues that the evidence in the record demonstrates that his

impairments result in limitations that are too extreme to allow him to perform the work of

a hand packer.  However, other than generally arguing that his limitations are more

extreme than determined by the ALJ, he does not address how these limitations

specifically preclude him from working as a hand packer.  Finally, to the extent that

Plaintiff asserts that he is too impaired to work at any job, that argument is without

merit.  No medical source in the record opined that Plaintiff was incapable of working at

all.  Plaintiff's argument on this point consists entirely of a description of the extent to

which his impairments allegedly impair his ability to function.  Absent further reference

to the standards used in assessing disability – i.e., reference to the Listing of

Impairments, the Grid or the Dictionary of Occupational Titles – there is no basis to

conclude that Plaintiff is impaired beyond the extent reflected in the RFC formulated by

the ALJ in this case.[4]

---

[4]     Plaintiff does not address the ALJ's alternative conclusion that, even if
        Plaintiff could not perform his past work as a hand packer, he was
        capable of performing work as a cleaner, laundry worker, cafeteria
        attendant, or kitchen helper/dishwasher.  (Tr. 22.)  Accordingly, even if the

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.


                                        s/ *Nancy A. Vecchiarelli*
                                        U.S. Magistrate Judge

Date: June 11, 2013



## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

ALJ erred in concluding that Plaintiff was capable of working as a hand packer, the ALJ's alternative conclusion precludes remand in this case.

23